**KAHN SWICK & FOTI, LLC**
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California 90067
Telephone: (504) 455-1400

*Counsel for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAREN ANDERSON and VALERIA GONZALEZ,<br><br>    Plaintiffs,<br><br>    v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and TURNER SPORTS INTERACTIVE, INC.<br><br>    Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>1. **Violation of California Invasion of Privacy Act (CAL. PENAL CODE §638.51)**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Maren Anderson and Valeria Gonzalez ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, there are over 100 members in the proposed Class, and at least one member of the proposed Class is a citizen of a different state than Defendants. This Court has personal jurisdiction over Defendants because they conduct substantial business in California and they purposefully directed activities to California by intentionally tracking individuals in California through the website: www.NCAA.com.

## NATURE OF THE CASE

1.    This is a class action against Defendant National Collegiate Athletic Association ("NCAA") and Defendant Turner Sports Interactive, Inc. ("Turner") (collectively, "Defendants") for violating California laws intended to protect individuals' privacy rights.

2.    Unbeknownst to their users, Defendants have partnered with various third parties, including Microsoft, to install sophisticated third-party tracking software on the landing page of their website, www.NCAA.com (the "Website" or

1

"NCAA Website") for analytic, marketing, advertising, and commercial purposes. Through the use of pixels, cookies, code snippets, and other technologies, these third-party trackers – the Adform Tracker, Adnxs Tracker, and Bounce Exchange Tracker (collectively, the "Trackers") surreptitiously capture, analyze, and store detailed information about NCAA Website visitors – including their Internet Protocol ("IP") addresses, browser and device information, unique digital identifiers, session data, clickstream activity, geolocation information, browsing history, and other personal information – without their consent or a court order. The Trackers also store cookies on users' browsers and send unique identifiers to the third parties that allow them to persistently track users not only on the NCAA Website, but across the internet and across multiple browsing sessions and devices.

3.      What is more, these third-party Trackers then share the personal data they have collected about NCAA Website users with numerous third parties, including registered data brokers such as Audiencerate, Ltd. ("Audiencerate") and OpenX Technologies, Inc. ("OpenX"). These third parties aggregate users' personal data, combine it with data they have obtained from other sources, and build comprehensive user profiles, which are sold to advertisers for targeted marketing and advertising purposes. This relentless and seemingly inescapable targeted advertising unnerves users, leaving them feeling surveilled and their privacy violated as they carry out the everyday task of navigating the Internet. This invasion of

privacy both unjustly enriches Defendant, who earns increased advertising revenue as a result of this tracking, and harms Plaintiffs and the Class, as their privacy rights are violated and their valuable personal information is being collected and shared without their consent.

4.      Because the third-party Trackers capture Website visitors' "routing, addressing, or signaling information" without their consent or a court order, they constitute illegal "pen registers" under California's Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE § 638.51.

5.      Plaintiffs bring this action on behalf of all California residents who accessed NCAA.com and had their IP addresses and other personal information collected by one or more third-party Trackers, including but not limited to the Adform Tracker, Adnxs Tracker, and/or Bounce Exchange Tracker, during the relevant time period, to recover statutory and compensatory damages and to prevent Defendants from further violating the privacy rights of California residents.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and at least one member of the Class is a citizen of a different state than Defendants.

7.      This Court has personal jurisdiction over Defendants. First, Defendant NCAA conducts substantial business in California by having 60 member schools in California, including multiple within this District, and Defendant Turner manages and creates digital entertainment for sporting events taking place in California and within this District. Second, Defendants have purposefully directed their activities to California by intentionally tracking individuals in California through the NCAA Website, which appeals to, and obtains substantial profits from, an audience in California. On information and belief, several million unique individuals visit the NCAA Website from California each month. Third, IP addresses are included in a user's HTTP request whenever a user visits the NCAA Website, and because an IP address can reveal geographic information and can be used to determine a user's city, state, and zip code, Defendants know that Plaintiffs and other members of the Class are located in California when they access the Website. Fourth, Defendants are also collecting Website visitors' IP addresses via the Trackers and targeting Californians with advertisements based in part on their California location. Fifth, one of the third-party Trackers Defendants have installed on their Website (the Bounce Exchange Tracker) is owned and operated by a California-registered data broker (Wunderkind Corp. f/k/a BounceX ("Wunderkind")). Sixth, Defendants offer subscriptions to NCAA Website visitors and, on information belief, offer such subscriptions to Website visitors that reside in California. And finally, Defendants

4

recognize their California customer base in their Privacy Policy for the NCAA website, which contains a section dedicated to California residents' privacy rights.[1]

8.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and (2) Defendants are subject to personal jurisdiction in this District.

## THE PARTIES

9.    Plaintiff Maren Anderson is, and has been at all relevant times, a resident and citizen of California, residing in the city of Los Angeles, within the Central District of California. Ms. Anderson has visited the NCAA Website numerous times, including on or about April 6, 2025. Ms. Anderson was in California when she visited the NCAA Website.

10.    Plaintiff Valeria Gonzalez is, and has been at all relevant times, a resident and citizen of California, residing in the city of San Francisco. Ms. Gonzalez has visited the NCAA Website numerous, including on or about July 7, 2025. Ms. Gonzalez was in California when she visited the NCAA Website.

11.    Defendant National Collegiate Athletic Association ("NCAA") is, and has been at all relevant times, an unincorporated association with its principal place

---

[1] *Privacy Policy, U.S. State Supplement,* WARNER BROS. DISCOVERY (Oct. 1, 2025), https://www.wbdprivacy.com/policycenter/usstatesupplement/en-us/ (last visited Dec. 3, 2025).

of business in Indianapolis, Indiana. The NCAA is a governing body for college athletics throughout the United States, including California. California contains the third-most NCAA-member schools of any state with 59 member schools.[2] The NCAA owns the NCAA Website, which features live video, scoring, ranking, news, and statistics for all college sports across all NCAA divisions.

12.    Defendant Turner Sports Interactive, Inc. ("Turner") is, and has been at all relevant times, a Georgia corporation with its principal place of business located in Lawrenceville, Georgia. Turner is part of the Turner Sports Network, owned by Warner Bros. Discovery, Inc., and is responsible for creating and managing digital platforms for sports entertainment events across the United States, including California. Defendant Turner operates the NCAA Website.[3]

## FACTUAL ALLEGATIONS

### I.    CIPA

13.    The California Legislature enacted CIPA to protect certain privacy rights of Californians, expressly recognizing that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . .

---

[2] *Membership Directory: 2024-25 NCAA Membership (All Sports)*, NCAA https://www.ncaa.org/sports/2021/5/3/membership-directory.aspx (last visited Dec. 3, 2025) (filtered by State: California).

[3] *See Warner Bros. Discovery Controllers and Affiliates Lists*, WARNER BROS. DISCOVERY, https://www.wbdprivacy.com/policycenter/affiliates/ (last visited Dec. 3, 2025) (listing Turner Sports Interactive, Inc. as the "controller" of NCAA.com).

has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." CAL. PENAL CODE § 630.

14.     To that end, CIPA prohibits, *inter alia*, "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." *Id.* § 638.51. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by a facility from which a wire or electronic communication is transmitted, but not the contents of a communication." *Id.* § 638.50(b).

15.     CIPA provides for a private right of action and imposes civil liability and statutory penalties for its violation in the amount of $5,000 per violation. *Id.* § 637.2(a)(1).

## II.     <u>IP Addresses</u>

16.     An IP address is a globally unique numerical identifier assigned by an Internet Service Provider to networking devices such as modems or routers, that guides or routes communications across the internet. IP addresses are often written as four sets of numbers separated by periods (*e.g.*, 192.555.455.145), with the first two sets of numbers indicating the network the device is connected to, and the second set of numbers identifying the specific device being used. IP addresses function as the essential addressing system of the internet and are necessary for routing internet communications to the correct location.

17.     An IP address can reveal geographical location information and can be used to determine the city, state, and zip code where the user is located at a particular point. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. By using IP addresses to target specific households, businesses or events based on their location (sometimes referred to as "geomarketing"), advertisers can avoid spending money on ads unlikely to be seen by their target audience.

18.     Moreover, IP addresses allow businesses to track user interactions and behaviors across multiple websites, building detailed profiles of users' browsing habits and preferences tied to their location. They are particularly powerful for identifying and tracking specific individuals. When individuals use their devices across different locations (such as home, work, coffee shops, or other locations), each location will have its own IP address. By tracking these patterns of movement between different IP addresses, companies can build detailed profiles of individual users' daily routines, movements, and behaviors, which may distinguish them from others who may be accessing the internet through the same IP address (such as other members of the same household).

19.     When combined with other information (such as browser type, device type, and user behavior) collected by cookies, trackers, and other technologies discussed herein, these IP address patterns allow companies to identify and track

specific individuals with remarkable precision, even when multiple people share the same IP address at a given location, and attach specific IP addresses to the comprehensive user profiles that they compile, thereby increasing their commercial value. For these reasons, Europe's General Data Protection Regulation ("GDPR") includes IP addresses as "identifiers" under its definition of "personal data."[4]

**III.    Cookies, Fingerprinting, and Identity Syncing/Resolution**

20.    Cookies are small computer files that are automatically generated and stored on a user's browser cache (a form of temporary storage) when a user visits a website. They consist of unique strings of text that typically contain identifiers such as user IDs or session tokens rather than full personal details. These identifiers act as digital tags that link users to data stored on a website's or ad network's servers; data that may include email addresses, IP addresses, browsing history, device characteristics, and other information associated with the user. Cookies enable a website or a tracking tool installed on a website to recognize returning visitors and remember user preferences or actions. There are two types of cookies: first-party and third-party.

21.    First-party cookies are created and stored directly by the web server of

---

[4] GDPR Article 4 defines "Personal Data" as "any information relating to an identified or identifiable natural person . . . ." GEN. DATA PROT. REGUL., Ch. 1, Art. 4 (2018), *available at* https://gdpr-info.eu/art-4-gdpr/. IP addresses fall into the GDPR's category of "online identifiers for profiling and identification." GEN. DATA PROT. REGUL., Recital 30 (2018), *available at* https://gdpr-info.eu/recitals/no-30/.

a website that a user is visiting, primarily in order to improve website functionality and the user's experience. By contrast, third-party cookies are created and stored by someone other than the owner of the website, most commonly advertising networks, analytics providers, or data brokers, and are designed to facilitate the collection and aggregation of user data for marketing, tracking, and profiling purposes. Unlike first-party cookies, which only assist in gathering user data when users interact with the owner's website, third-party cookies can enable third parties such as advertising networks, analytics providers and data brokers to recognize a user's computers both when it visits the website in question and also when it visits other websites, and can thereby track users across multiple websites to provide a more comprehensive picture of users' behavior and monitor their online behavior. This is incredibly useful for advertisers because specific user data can enhance their success at targeted marketing. The Trackers discussed herein use third-party cookies, among other technologies, to track Website visitors.

22.     While the number of functions a cookie can perform is vast, it can only contain so much text, as it is restricted in size. To address this issue, most modern cookies now only contain a unique ID, while the associated data – such as inferred interests, demographics, or browsing history – is maintained on the third-party's servers. This structure enables companies to store, analyze, and enrich user data at scale while using the small cookie file solely as a reference key. In practice, the

cookie's value lies not in the data it directly contains, but in the server-side profile it links to.[5]

23.    Cookies pose significant privacy and data security risks, as they enable website owners to build up detailed user profiles that may include users' personal information such as their gender, religion or sexuality – information that can potentially be used to invade user privacy, spread misinformation, commit identity theft, blackmail individuals, or perpetrate fraud. Moreover, clearing cookies or switching browsers may not fully prevent tracking, as many advertising, tracking and data broker companies supplement cookies with device fingerprinting, probabilistic ID matching, or local storage mechanisms that achieve the same effect of persistent identification.

24.    Cookies are domain-specific, which means that cookies created by one third-party tracker cannot be read by another third-party tracker. However, most advertising platforms are able to overcome this limitation through "cookie syncing." This is a process by which two different advertising platforms "map" each other's unique IDs and subsequently share information they have both gathered about the same user, thereby allowing them to track users across various websites.  Without

---

[5] *What is Cookie Syncing and How Does it Work?*, CLEARCODE (May 2, 2025), https://clearcode.cc/blog/cookie-syncing/ (last visited Dec. 3, 2025).

cookie syncing, the targeting capabilities of advertisers would be severely limited.[6]
As discussed herein, the Adform Tracker and Adnxs Trackers engage in cookie
syncing with various third-parties, including registered data brokers OpenX and
Audiencerate.

25.    In 2020, in an effort to enhance user privacy, Google announced that it
would be phasing out, or "deprecating," third-party cookies in its web browser
Chrome – used by nearly 3.5 billion individuals worldwide.[7] The initial deadline for
the phasing out was 2022, which was postponed several times due to regulatory
pressures until it was scrapped in 2024.[8] Other web browsers have various
restrictions on third-party cookies, including Mozilla Firefox, Apple Safari, and
Brave.[9] Increasing privacy regulations and evolving consumer expectations are also

---

[6] *Id.*; *Cookie Syncing Explained*, AD TECH EXPLAINED (Sept. 30, 2019),
https://www.adtechexplained.com/p/cookie-syncing-explained/ (last visited Dec. 3,
2025).

[7] *Google Cookie Deprecation Reversal: What it Means for Marketers in 2025?*,
COOKIEYES (Sept. 15, 2025), https://www.cookieyes.com/blog/google-cookie-
deprecation/ (last visited Dec. 3, 2025); *Third-Party Cookies Going Away? Here's
What's Actually Happening*, COOKIEYES (May 28, 2025),
https://www.cookieyes.com/blog/third-party-cookies-going-away/ (last visited Dec.
3, 2025).

[8] *A New Path for Privacy Sandbox on the Web*, PRIVACY SANDBOX (July 22, 2024),
https://privacysandbox.com/news/privacy-sandbox-update/ (last visited Dec. 3,
2025); *Next Steps for Privacy Standbox and Tracking Protections in Chrome* (Apr.
22, 2025), https://privacysandbox.google.com/blog/privacy-sandbox-next-steps,
last visited Dec. 3 2025. "Privacy Sandbox" is an initiative led by Google to create
standards for websites to access user information while protecting privacy.

[9] *What a World Beyond Third-Party Cookies Means for Digital Advertising*,
EPSILON, https://www.epsilon.com/us/insights/third-party-cookies (last visited Dec.
3, 2025).

expected to  contribute to the decline of third-party cookies.

26.    The potential obsolescence of third-party cookies, on which advertisers have relied for years to track user behavior, serve highly targeted ads, and measure campaign performance, presents a number of serious challenges to advertisers.[10] Thus, while they continue to rely on third-party cookies (for the most part), digital advertising companies (including those discussed herein) have been working on coming up with alternative solutions and strategies to maintain effective tracking, ad targeting, and ad campaign measurement without third-party cookies.

27.    One alternative to third-party cookies is to utilize "first-party data" (sometimes referred to as "1P ID" or "1P data"). First-party data is "information businesses collect directly from their users through interactions on owned channels such as websites, mobile apps, and offline stores." First-party data "originates directly from user engagement,"[11] as opposed to "third-party data" (sometimes referred to as "3P ID" or "3P data"), which comes from external third parties. As discussed herein, Wunderkind uses first-party data.

28.    Another alternative solution is "device fingerprinting," which is "a tracking technique that identifies a device based on its unique configuration. A device fingerprint consists of a unique identifier created by collecting a device's

---

[10] *Third-Party Cookies Going Away?, supra* note 7.

[11] *8 Best Third Party Cookie Alternatives in 2025*, COOKIEYES (May 28, 2025), https://www.cookieyes.com/blog/cookie-alternatives/ (last visited Dec. 3, 2025).

hardware and software information, such as browser type, operating system, screen resolution, and installed fonts. Several of the technologies discussed herein, including Wunderkind, engage in device fingerprinting. Unlike cookies, which are stored client-side, device fingerprints are stored server-side, offering a persistent way to track users across sessions and platforms." Further, device fingerprints remain effective even when cookies are deleted and blocked.[12]

29.    Another alternative to third-party cookies is "identity ("ID") resolution/syncing," also referred to as "digital fingerprinting." ID syncing plays a crucial role in today's fragmented digital advertising ecosystem, where users frequently move between apps, browsers, and devices. It works by connecting and reconciling disparate customer data and identifiers from multiple sources – including first- and third-party sources – into a single unique user identifier. By synchronizing users' identifiers across platforms, advertisers can maintain continuity, ensuring users are consistently recognized and targeted across different digital contexts, thereby increasing the commercial value of their data for targeted advertising purposes. Further, when combined with the additional data obtained through tracking technologies and cookies, digital fingerprinting enables broad and detailed user profiling. If a user profile is sufficiently detailed, it can enable the identification of that user by using their personal information aggregated from multiple sources.

---

[12] *Id.*

Many of the technologies discussed below that are employed on the NCAA Website, including Adform and Wunderkind, engage in digital fingerprinting.

## IV.   **The Digital Advertising Marketplace**

30.   At the heart of today's digital advertising marketplace – and this case – is "Real-Time Bidding" ("RTB"). RTB "is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application." RTB "happens 178 trillion times every year across the U.S. and Europe."[13]

31.   The RTB process consists of a number of different platforms and systems within the digital advertising ecosystem, of which the main ones are: (i) publishers; (ii) supply side platforms ("SSPs"), (iii) demand side platforms ("DSPs"); (iv) advertising servers; (v) advertising exchanges; and (iv) data brokers.[14]

32.   "The publisher is the website that users visit" – in this case, the NCAA Website. "When a publisher decides to create a revenue stream through display advertising, they make ad space (ad slots) available on their website for potential

---

[13] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/ (last visited Dec. 3, 2025).

[14] *Id.*; *see also How Does Real Time Bidding Work?*, CLEARCODE (Aug. 29, 2025), https://clearcode.cc/blog/real-time-bidding/ (last visited Dec. 3, 2025).

content, known as inventory."[15]

33.    "SSPs primarily work with website or app publishers to help them participate in the RTB process." In other words, SSPs "help[ ] publishers monetize their websites and mobile apps by managing, selling and optimizing their available inventory (aka ad space)."[16]

34.    A DSP "is an advertising technology (AdTech) platform that allows advertisers working at brands and ad agencies to buy inventory (aka ad space) on an impression-by-impression[17] basis from publishers via supply-side platforms (SSPs) and ad exchanges."[18] "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[19] "DSPs enable media buyers (advertisers and agencies) to purchase a range of inventory from many different publishers all from one user interface."[20] But DSPs are more than just middlemen; they also "[c]reate, run and manage a number of campaigns

---

[15] *How Does Real Time Bidding Work*, *supra* note 14.

[16] *Id.*; *Top Supply-Side Platform (SSP) and Ad Exchange Companies*, CLEARCODE (Aug. 2, 2025), https://clearcode.cc/blog/ssp-and-ad-exchange-companies/ (last visited Dec. 3, 2025).

[17] An "impression" is the number of times an advertisement is displayed on someone's screen. *See Impressions in Digital Marketing: What Are They and Why do They Matter?*, DASHTHIS, https://dashthis.com/blog/impressions-in-digital-marketing/ (last visited Dec. 3, 2025).

[18] *What is a Demand-Side Platform (DSP) and How Does it Work?*, CLEARCODE (Apr. 23, 2025), https://clearcode.cc/blog/demand-side-platform/ (last visited Dec. 3, 2025).

[19] *What is Real Time Bidding*, *supra* note 13.

[20] *What is a Demand-Side Platform, supra* note 18.

simultaneously across multiple SSPs and ad exchanges and control them from a single, centralized user interface"; "[a]uto-optimize (via algorithms) the campaigns to increase ROIs [returns on investment]"; [u]se 3rd-party data from DMPs [Data Management Platforms][21] to improve targeting"; and [p]rovide real-time reporting via advanced analytics."[22]

35.    An advertising server is a technology platform used by publishers, advertisers, agencies, and networks to manage and run online advertising campaigns. Some ad servers have DSP and/or SSP features.[23]

36.    An advertising exchange "is a marketplace where buyers and sellers come together to trade digital media." The buyers (advertisers and agencies) use DSPs to bid on individual impressions, which are put up for sale by sellers (publishers) via SSPs. This buying and selling process is handled through RTB.[24]

37.    "Nearly every time a person loads a page on a website or an app, an RTB auction takes place, largely unknown to the person. This auction broadcasts

---

[21] A Data Management Platform is a software system that collects, organizes, and analyzes customer data from various sources to create detailed audience profiles for targeted digital advertising and marketing. *See What is Data Management Platform (DMP)?*, ORACLE, https://www.oracle.com/cx/marketing/data-management-platform/what-is-dmp/ (last visited Dec. 3, 2025). Essentially, data brokers are the source of data, while DMPs are a tool to use that data.

[22] *What is a Demand-Side Platform, supra* note 18.

[23] *What is an Ad Server and How Does it Work?*, CLEARCODE (July 2, 2025), https://clearcode.cc/blog/what-is-an-ad-server/ (last visited Dec. 3, 2025).

[24] *Top Supply-Side Platform, supra* note 16.

private information about the person to facilitate the bidding process to determine which ad will be shown to the person." The RTB process takes place in real time, in a manner of approximately 100 milliseconds.[25]

38. The way the RTB auction takes place is as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges in a process known as an "RTB bid request." The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user. The prospect of obtaining bidstream data drives many companies to participate in the auction process even if they have no intention of ever placing an advertisement. Moreover, after data is broadcast, there is no way to know how entities will handle the data.

This process is repeated every time a user accesses a website, a new page, or refreshes the page.[26]

39. The more information DSPs are able to collect and compile about users, the more value the data has for targeted advertising purposes and the higher the bids

---

[25] *Id.*; *What is a Demand-Side Platform, supra* note 18.

[26] *What is Real Time Bidding, supra* note 13.

will be. Much of this is facilitated through the installation of trackers on users' browsers and the use of data brokers.

40.    Under California law, a "data broker" is "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct relationship (subject to certain exceptions not applicable here). *See* CAL. CIV. CODE 1798.99.80(c). Any entity that qualifies as a "data broker" under California law must specifically register as such. *Id.* § 1798.99.82(a).

41.    Data brokers such as OpenX and Wunderkind, discussed below, sell users' data to DMPs, DSPs, and other online advertising companies.[27]

42.    Targeted advertising makes users "feel violated and unnerved by these practices."[28] In a survey conducted by a digital advertiser, 40% of respondents said targeted advertisements felt "unnerving" and 27% of respondents called such advertising "a violation."[29]

## V.    Defendants' Surreptitious Installation and Use of Third-Party Trackers

43.    When an individual visits the NCAA Website, whether on a computer

---

[27] *Data Broker*, CLEARCODE, https://clearcode.cc/glossary/data-broker/ (last visited Dec. 3, 2025).

[28] Megan Poinski, *Targeted Ads Are Getting Creepy , Consumers Say*, FORBES (Mar. 19, 2025) https://www.forbes.com/sites/cmo/2025/03/19/targeted-ads-are-getting-creepy-consumers-say/ (last visited Dec. 3, 2025).

[29] *Id.*

or a mobile device, their browser sends an "HTTP request" or a "GET" request to Defendants' servers, which includes the individual's IP address, and Defendants respond with an "HTTP response" back to the browser with a set of instructions of how to load and display the NCAA Website content.

38.     The HTTP response also causes one or more third-party Trackers to be installed on the user's browser. The Trackers then cause the user's browser to send personally identifying information to third-party servers associated with the Trackers, including the user's IP address, device and browser information, and other personal information. The Trackers also store third-party cookies in the browser caches on the users' devices, enabling the third parties to recognize returning users and correlate their browsing activity across different internet sessions, websites, and devices.

44.     On the user's subsequent visit(s) to the NCAA Website, the Trackers locate the unique cookie identifier on the user's browser and cause the browser to again send the user's IP address, device information, and other personally identifying information, to the third-party. In the event that a user clears their cookies, the Tracker(s) will be wiped from their browser cache, and the next time he or she visits the NCAA Website, the process will begin all over again.

45.     The Trackers that Defendants are installing on Website users' browsers analyze and store the data collected from Website users and, in many cases, combine

it with other data they have obtained about users, to more accurately target advertising to them and optimize the performance of marketing campaigns – with the goal of Defendants earning additional revenue at the expense of users' privacy.

46.     The personal information obtained and distributed by Defendants has significant economic value as consumers' personal information is viewed as a form of currency in the e-commerce industry. Consumers, like Plaintiffs and all Class Members, suffer economic injury as a result of Defendants accessing and using their personal information, and Defendants sharing their information with third parties.

47.     Plaintiffs and Class Members are also injured by losing their right to control their personal information and their ability to remain anonymous as they navigate the internet.

48.     Defendants knowingly embed and execute the Trackers on the NCAA Website. By choosing to integrate these technologies, Defendants cause the browsers of Website users to establish direct connections with those third parties' servers, thereby transmitting visitors' IP addresses, device identifiers, and communications content to the third parties. Defendants exercise control over which third-party trackers are installed on their Website, and they profit from the data and advertising revenue generated by those Trackers. Accordingly, Defendants are directly responsible for the interception and disclosure of visitors' communications.

49.     Defendants do not request or obtain consent from users before installing

the Trackers on their browsers, nor are users presented with any pop-up window, banner, or any other notification informing them that Defendants will be installing the Trackers or collecting their IP addresses and other personally identifying information.

50.    The NCAA Website instantaneously collects and sends to the third parties users' IP addresses and other personal information as soon as they enter the NCAA Website. A user does not need to scroll through or interact with the Website for Defendants to collect their IP address or other personal information.

51.    Because the Trackers capture website visitors' "routing, addressing, or signaling information" (in the form of their IP addresses) without their consent or a court order, they constitute illegal "pen registers" under CIPA. CAL. PENAL CODE § 638.51.

### A. **The Adform Tracker**

52.    One of the Trackers installed by Defendants on the NCAA Website is the Adform Tracker.

53.    Adform is a global technology company offering a comprehensive digital advertising platform that includes a DSP, SSP, and an ad server. "Adform's technology is used by its customers . . . to create and deliver rich and diverse online marketing campaigns using modern technology and innovative tools," "to collect and store data about Internet users and use them for analysis and online behavioral

advertisements," and "deliver more relevant advertising to [users] at the websites and mobile applications [they] visit." Adform is able to provide such technology through its large-scale surveillance of users across the internet, including through the use of cookies."[30]

54.    When a user visits the NCAA Website, their browser sends an HTTP request to Defendants' server (which includes the user's IP address), Defendants' server sends an HTTP response with directions to install the Adform Tracker on the user's browser, and the Adform Tracker stores cookies on the user's browser, and instructs the user's browser to automatically transmit the user's IP address and other personally-identifying information to Adform, which Adform then shares with multiple third party ("partners") for cookie and ID syncing.

55.    One of the Adform cookies that is stored on users' browsers when they visit the NCAA Website is the "uid" ("unique identifier") cookie, which persists on users' browsers for 60 days. As its name suggests, the uid cookie "[c]ontains a unique ID to identify a user."[31]

---

[30] *Privacy Policy & Opt-Out*, ADFORM, https://site.adform.com/privacy-policy-opt-out/ (last visited Dec. 3, 2025); *Adform Cookies*, ADFORM, https://site.adform.com/privacy-center/adform-cookies/ (last visited Dec. 3, 2025).

[31] *Adform Cookies*, *supra* note 30; *Adform Product and Services Privacy Policy*, ADFORM (June 26, 2025), https://site.adform.com/privacy-center/platform-privacy/product-and-services-privacy-policy/ (last visited Dec. 3, 2025); *uid*, COOKIELIBRARY.ORG, https://cookielibrary.org/cookie_consent/uid/ (last visited Dec. 3, 2025).

56.    Adform collects from Website users their "1st Party IDs, Cookie IDs, and technical data related to these IDs (e.g. impressions, clicks, conversions, approximate geolocation, timestamp, URL, device information, browser information), IP address." Adform also "collect[s] information about [users'] actions on [its] clients' websites or apps, like the content [users] view or data [it] receive[s] from [its clients" . . . [which] may be "combine[d] with [the user's] previous actions or those of similar users, to create or enhance a profile about [the user], including [the user's] potential interests and personal characteristics."[32]

57.    A key component of Adform's digital advertising offerings is ID syncing. Adform transmits Cookie IDs or other IDs to at least 58 third-party "partners," who can then align user identities across various systems, allowing them to create a comprehensive digital profile of a user as they navigate between apps, browsers, and devices. Some of the third parties with whom Adform shares Website visitors' data for cookie and ID syncing are Audiencerate and OpenX.[33]

### 1. **Audiencerate**

58.    Audiencerate, a California registered data broker,[34] is a digital advertising company whose "role is to help advertisers in providing more relevant

---

[32] *Adform Products and Services Privacy Policy, supra* note 31; *Adform Cookies, supra* note 30.

[33] *Id.*

[34] *See* Data Broker Registration for Audiencerate, https://www.oag.ca.gov/data-broker/registration/189411 (last visited Dec. 3, 2025).

advertising to users." According to Audiencerate, it "support[s] companies and brands in achieving effective, privacy-compliant audience targeting through cutting-edge technologies and the advanced application of Artificial Intelligence."[35] Audiencerate accomplishes these goals, *inter alia*, through the use of cookies and identifiers.[36]

59.    In connection with the Adform Tracker, NCAA Website visitors' browsers may also transmit or reference identifiers associated with Audiencerate's third-party cookies. Some of these cookies include the "arcki2" and "arcki2_adform" cookies (the "Audiencerate Cookies"). The arcki2 cookie "gather[s] information on user engagement and behaviour in order to improve website performance and increase the relevance of online advertisements." The arcki2_adform cookie is "[u]sed by Adform and its partners to identify a visitor to serve relevant advertising." The Audiencerate Cookies are used to provide targeted advertisements to users through third-party advertisement centers facilitating real-time bidding for advertisers, and persist on a user's device for 15 days.[37]

---

[35] *Audiencerate*, AUDIENCERATE, https://audiencerate.com/about-us (last visited Dec. 4, 2025).

[36] *Data Regulamentation Policy*, AUDIENCERATE, https://audiencerate.com/privacy/ (last visited Dec. 3, 2025).

[37]    *arcki2*,   COOKIESEARCH,   https://cookiesearch.org/cookies/?search-term=arcki2&filter-type=cookie-name&sort=asc&cookie-id=arcki2 (last visited Dec. 3, 2025); *arcki2_adform*, COOKIE.IS, https://www.cookie.is/arcki2_adform (last visited Dec. 3, 2025).

60.    Audiencerate gathers Website visitors' information such as "a platform ID (an identifier that allow[s] [it] to provide [its] services), IP address, URL visited (as the Third Party Data Source), time, hour and location, browser and browser version and Cookie ID of [its] platform's partners."[38]

61.    Audiencerate further engages in "cross device linking and cross app advertising," linking its user profiles across their devices and allowing it to conduct targeted advertising to users "between different websites, browsers and platforms." Based on the user information it obtains, Audiencerate creates detailed user profiles "to help advertisers in providing more relevant advertising to users: for example, a user that visits travel sites often, will be categorized in a 'travel lover' group, in such way he will be served advertisements that could be interesting for him."[39]

62.    In the below illustrative screenshot, the Website visitor's IP address and additional information about their device (see the red box inside the second box in the left-hand column, and the third red box in the left-hand column) are being shared by Adform (see the bottom box in the left-hand column) with Audiencerate (see the top red box in the left-hand column), through the Audiencerate Cookies stored on the user's browser (see the second red box in the left-hand column).

---

[38] *Data Regulamentation Policy*, *supra* note 36.

[39] *Id.*

2.    **OpenX**

63.    OpenX, a California registered data broker,[40] is "the world's leading independent supply-side platform [SSP] for audience, data, and identity targeting," connecting companies offering advertising space on their websites with brands, advertising agencies, and DSPs looking to purchase such space in order to advertise

---

[40]    *See Data Broker Registration for OpenX*, CAL. ATT'Y GEN., https://www.oag.ca.gov/data-broker/registration/193614 (last visited Dec. 3, 2025).

their products or services to consumers.[41]

64.    Through "cookies and other persistent identifiers that track [users']

online activity," OpenX collects the following personal data from Website visitors:

(i) users' "unique online identifiers," which are "persistent identifiers that help

[OpenX] identify [users] across devices and over time, such as . . . IP address, cookie

ID, mobile advertising ID, hashed email address, and user agent string"; (ii) "online

and offline activity and interests (including inferences)," which includes "browsing

history and online behavior," and may also include "information about [users']

offline activity and interests, such as [their] purchase history" and "information

derived or inferred from [their] online and offline activity and interests, such as

[their] likelihood to be interested in buying a particular product, using a particular

service, or visiting a particular website"; (iii) "geolocation information" such as

"country, region, metro, zip, or postal code, or geographic coordinates, typically as

inferred from [user's] IP address," (iv) "browser, device, and service information,"

such as "browser or device type . . . screen dimensions, operating system, and

preferred language"; and (v) "ad reporting and delivery information," which is

"information about the advertisements [users] have been served and how [they]

---

[41] "About Us," OPENX, https://www.openx.com/company/ (last visited Dec. 3, 2025); *OpenX Ad Exchange Privacy Policy*, OPENX (Nov. 18, 2025), https://www.openx.com/privacy-center/ad-exchange-privacy-policy/(last    visited Dec. 3, 2025).

interacted with them, such as the size and format of advertisements [they] were served and whether [they] clicked on them." Cookies "allow[ ] [OpenX] to collect information about [Website visitors'] browsing habits over time in order to facilitate interest-based advertising and make advertising more relevant to [them] and [their] interests."[42]

65.    In connection with the Adform Tracker and other integrated advertising technologies, Website visitors' browsers may also store or transmit cookies associated with OpenX's advertising systems. One of these cookies is the "i" cookie, which contains a unique identifier used by OpenX to recognize a browser or device and record ad delivery events. The i cookie enables OpenX to link a user's browser or device to its internal records and to information shared by its advertising partners during bid requests. When a user visits a website participating in OpenX's exchange, the browser automatically transmits the cookie identifier along with connection metadata, such as IP address, timestamp, and referrer, to OpenX's servers. "By matching this cookie with data collected by Advertising Partners, [OpenX] and [its] Advertising Partners can deliver more relevant ads...." The i cookie remains on users' browsers for one year "and is refreshed for the next year on each bid request." In other words, when a user visits the NCAA Website, OpenX "assign[s] a unique identifier . . . to [their] browser or device, which allows OpenX's Ad Exchange to

_____

[42] *OpenX Privacy Policy, supra* note 41.

"automatically recognize [the user's] browser or device the next time it visits another website or digital property owned by a Publisher [OpenX] work[s] with." "This means that, over time, [OpenX's] Ad Exchange can track [users'] online activity to learn about [their] online browsing behavior and preferences."[43]

66.    OpenX tracks users "across different websites and apps, and across different devices" by "[u]sing cookies and other persistent identifiers." This persistent tracking across a user's devices lets OpenX know, for example that the user "visited a website on Monday from [the user's] desktop computer to look at a product, returned to the website on Tuesday from [the user's] mobile phone to add the product to [the user's] check-out basket, and finally completed [the user's] purchase of the product on Wednesday from [the user's] tablet."[44]

67.    OpenX uses the information it gathers "[t]o facilitate interest-based advertising," to "learn about [users] online activity across sites, apps, and devices over time and infer information about [users'] online and real-world preferences," and to measure and improve "ad performance."[45]

68.    OpenX shares the user data it collects with its advertising partners, as well as "third party data aggregators or data partners . . . so that they can combine

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

this information with other information they have independently collected to understand . . . [users'] online activity and preferences across sites, apps, and devices over time."[46]

69.    OpenX also engages in cookie syncing: "The Publishers and Advertising Partners we work with can also map their own unique identifiers against our OpenX identifier via a process called 'cookie syncing,' so that they can use data they have collected independently on our Ad Exchange."[47]

70.    OpenX's proprietary ID resolution product, OpenAudience, helps publishers "utilize [their] 1P data, leverage 3P data, and package up audiences for marketers that will drive ad revenue." It does this by "[m]atch[ing] [web]site visitors' data to third-party identifiers to create a unified, resolved view of [ ] users." OpenX has an "identity graph of more than 200 million unique people," which "helps [advertisers] identify, reach, and engage [their] perfect audience," "enable more effective audience targeting," and "drive ad revenue." The identity graph was created by "integrat[ing] prime, quality data from leading third-party identity and audience data partners," including 800 million hashed email addresses and 200 million hashed phone numbers, and more than 200 million "US Users Instrumented

---

[46] *Id.*

[47] *Id.*

31

for Data and Identity."[48]

71.     Defendants have installed the OpenX Tracker on the Website to monetize it by participating in OpenX's advertising exchange network. By collecting Website users' IP addresses and disclosing them to OpenX, Defendants enables OpenX to serve targeted advertisements based on users' geographic locations. These advertisements appear on the Website, generating revenue for Defendants through impressions and clicks. By integrating OpenX's tracking technology, Defendants benefit financially from these targeted ad placements while exposing users' personal data without proper disclosure or consent. Through this unauthorized disclosure of user data, Defendants have prioritized their commercial interests over users' privacy rights.

72.     In the below screenshot, the Website visitor's IP address (see the top red box in the right-hand column) is being shared by Adform with OpenX (see the second and third red boxes in the left-hand column), along with the uid identifier that was set by the uid cookie (see the red box in the top left-hand column). The screenshot also shows the i cookie being stored on the user's browser (see the bottom red box in the right-hand column).

---

[48] *Publishers*, OPENX, https://www.openx.com/publishers/ (last visited Dec. 3, 2025); *Data Activation*, OPENX, https://www.openx.com/why-openx/openaudience/ (last visited Dec. 3, 2025).

**B. The Adnxs Tracker**

73.    Another third-party Tracker installed by Defendants on the NCAA Website is the "Adnxs Tracker" (Adnxs.com), which was developed by Xandr, Inc., a software company acquired by Microsoft in 2021. Microsoft owns and operates the Adnxs Tracker, which is part of a suite of tools provided by Microsoft to its customers as part of its Microsoft Advertising ecosystem (also called "Microsoft Invest").

74.     When an individual visits the NCAA Website, their browser sends an HTTP request to Turner's server (which includes the user's IP address), Turner's server sends an HTTP response with directions to install the Adnxs Tracker on the user's browser, and the Adnxs Tracker instructs the user's browser to automatically transmit the user's IP address and other personally-identifying information to Microsoft and stores cookies on the user's browser.

75.     "The Microsoft Advertising platform is a real-time bidding system and ad server." Microsoft Advertising (*i.e.*, the ADNXS Tracker) touts its "innovative programmatic offerings," enabling advertisers and publishers to "[r]each the right audience across their digital life through rich ad experiences, consumer intelligence and within our expansive network, including exclusive partnerships." Microsoft Advertising provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[49] In other words, Microsoft facilitates the selling of NCAA Website users to interested advertisers, who bid to show those users advertisements that are targeted to their identity and location.

76.     To do this, Microsoft utilizes data from its cookie store. After Microsoft receives advertising bids, it "overlay[s] segment data from [its] server-side cookie

---

[49]    *About Microsoft Invest*, MICROSOFT (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest (last visited Dec. 3, 2025); *Discover What's Possible*, MICROSOFT ADVERTISING, https://about.ads.microsoft.com/en#ad-technology (last visited Dec. 3, 2025).

store. Data is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [Microsoft] also contact[s] third-party data providers and overlay[s] any available data."[50]

77.    Some of the cookies installed by the Adnxs Tracker on individuals' browsers when they visit the NCAA Website are the "uuid2," "XANDR_PANID," and "anj" cookies (collectively, the "Adnxs Cookies").

78.    The uuid2 cookie is used to enable targeted advertising and measure the performance of those advertisements. The XANDR_PANID cookie is a marketing cookie used "to store a unique randomly generated value that enables [Microsoft Advertising] to distinguish browsers and devices." The anj cookie is a marketing cookie that "contains data denoting whether a cookie ID is synced with their partners."[51]

79.    The persistent nature of the Adnxs Cookies allows Microsoft to maintain continuous tracking of users across multiple browsing sessions by linking new IP addresses to the unique cookies. While a user's IP address may change between Website visits (for instance, when accessing the NCAA Website from different locations), the identifiers associated with the cookies remain constant for

---

[50] *Id.*

[51] *uuid2*, COOKIE.IS, https://www.cookie.is/uuid2 (last visited Dec. 3, 2025); *XANDR_PANID*, https://www.cookie.is/XANDR_PANID (last visited Dec. 3, 2025); *Anj*, https://www.cookie.is/anj (last visited Dec. 3, 2025).

approximately 90 days,[52] unless a user manually "clears" their cookies (upon which the Adnxs Tracker will automatically generate new, unique cookies).

80.     Through these mechanisms, the Adnxs Tracker engages in a process of "fingerprinting" each user who browses the NCAA Website. When a user visits the NCAA Website, their browser transmits their IP address, cookie information, and other data to Microsoft's servers, which allows Microsoft to correlate multiple IP addresses and browsing events with a single user profile over time, creating a comprehensive record of the user's geographic locations and Website activities across all their devices, including the various IP addresses and locations from which the NCAA Website was accessed.

81.     By permitting the Adnxs Tracker to operate on the NCAA Website and to transmit users' IP addresses and other connection data to Microsoft, Defendants enable Microsoft Advertising to deliver sponsored or personalized advertising based on users' geographic location and browsing activity. These advertisements appear within or alongside NCAA Website content and generate revenue for Defendants when users view or interact with them.

82.     Microsoft also shares user data with third parties. Xandr's website contains a list of dozens of "third party partners which may receive Platform Data

---

[52] *Id.*

and other information . . . as a result of their partnership with Xandr or due to the partnerships with Xandr customers using Xandr's technology" one of which is BounceX (Wunderkind), discussed below.[53] Microsoft integrates with the Bounce Exchange Tracker on the NCAA Website to enrich Defendants' user data and therefore obtain higher bids to show advertisements to Defendants' users. In other words, when users visit the NCAA Website, Microsoft collects users' IP addresses through its Adnxs Tracker to provide to advertisers interested in showing an advertisement to Defendants' Website users, enriching that information by integrating with the Bounce Exchange Tracker, and ultimately enabling Defendants to monetize the NCAA Website and maximize revenue by collecting and disclosing user information.

83.    Defendants have installed the Adnxs Tracker on the Website to monetize it by participating in Adnxs' content recommendation network. By collecting Website users' public IP addresses and disclosing them to Adnxs, Defendants enables Adnxs to serve targeted advertisements based on users' geographic locations. These advertisements appear alongside or within Website content, generating revenue for Defendants through impressions and clicks. By integrating Adnxs' tracking technology, Defendants benefit financially from these

---

[53] *Third Party Providers*, XANDR (Oct. 22, 2025), https://learn.microsoft.com/en-us/xandr/policies-regulations/third-party-providers (last visited Dec. 3, 2025).

targeted ad placements while exposing users' personal data without proper disclosure or consent. Through this unauthorized disclosure of user data, Defendants have prioritized their commercial interests over users' privacy rights.

84.    The following is a screenshot demonstrating the operation of the Adnxs Tracker on an NCAA Website visitor's browser. In this example of the information exchanged while a user browses the NCAA Website, the user's browser and device information appear in the third red box in the left-hand column, and the user's IP address appears in the red box in the right-hand column. This information is being transmitted through the Adnxs Tracker to a domain associated with Adnxs, ib.adnxs.com (see the top red box in the left-hand column), which Defendants installed on the user's browser along with the Adnxs Cookies (see the second red box in the left-hand column).

## C.    **The Bounce Exchange Tracker**

85.    Another third-party tracker installed by Defendants on NCAA Website

visitors' browsers is the Bounce Exchange Tracker, which is developed, owned, and

operated by Wunderkind.

86.    When a user visits the NCAA Website, their browser sends an HTTP

request to Turner's server (which includes the user's IP address), and Turner's server

sends an HTTP response with directions to install the Bounce Exchange Tracker on the user's browser, and the Bounce Exchange Tracker instructs the user's browser to automatically transmit the user's IP address and other personally identifying information to Wunderkind.

87.    Wunderkind, a DSP and registered data broker in the State of California,[54] is a behavioral automation software and analytics company that helps its clients "drive higher engagement from their website visitors" through its advertising platforms.[55] According to Wunderkind, its "custom [ad] placements are designed to fit both [its] advertiser and publishing partners' needs." "A WunderKIND Ad experience drives results."[56]

88.    The way this works is through the collection by Wunderkind of Website users' personal information – including, but not limited to "[b]rowsing history, search history, [and] information on a consumer's interaction with a website, application, or advertisement." Wunderkind "may transfer data collected through … [its] marketing activities to entities such as "(i) website analytics vendors, who collect cookie and website engagement information to help understand website

---

[54] *See Data Broker Registration for Wunderkind Corp.*, CAL DEP'T JUST., https://www.oag.ca.gov/data-broker/registration/191359 (last visited Dec. 3, 2025).

[55] *Wunderkind Corporation: Privacy Policy*, WUNDERKIND (Sept. 26, 2025), https://www.wunderkind.co/privacy/ (last visited Dec. 3, 2025).

[56] *Stop Annoying Your Audience with Intrusive Ads*, WUNDERKIND, https://www.wunderkind.co/how-it-works/advertising-solutions-for-advertisers-and-publishers/ (last visited Dec. 3, 2025).

performance, (ii) advertising vendors, who collect cookie and website engagement information to target relevant advertising, and (iii) email marketing and lead database vendors, who collect email address and other personal information to improve email marketing efforts."[57]

89.    Wunderkind is also an "AI decisioning platform that helps brands drive more revenue by increasing reach through identity," through its "proprietary identity graph [that] resolves anonymous traffic into known users . . . ." Indeed, Wunderkind claims that its "Identity Network recognizes over 9 billion consumer devices and 1 billion consumer profiles and stores them in [its] Identity Graph."[58] Wunderkind is able to do this by matching the information it already has about users with the information it is collecting via the Bounce Exchange Tracker.

90.    Because, as discussed earlier, third-party cookies are on the decline, Wunderkind has created alternative methods to track and identify users across browsers and devices. As Wunderkind explains, "[u]nlike other solutions, Wunderkind's Identity Network is built on first-party data and is not dependent on outside vendors or third-party cookies."[59]

91.    Wunderkind recently partnered with Meta Ads Manager to bolster its

---

[57] *Wunderkind Privacy Policy, supra* note 55.

[58]    *How Wunderkind Converts Identity Into Revenue*, WUNDERKIND, https://www.wunderkind.co/how-it-works/performance-marketing-solutions-for-ecommerce/ (last visited Dec. 3, 2025).

[59] *Id.*

first party cookie tracking capabilities, noting on its website that Meta's "pixel sits on millions of websites, quietly collecting first-party behavioral data that fuels retargeting, lookalike creation, and optimization across Facebook, Instagram, and beyond."[60] Meta Ads Manager provides the browsing behavior data and Wunderkind provides the user identification data by "recogniz[ing] who that shopper is, whether they've opened an email, clicked a text, or are in a triggered abandonment flow."[61] This partnership allows third parties to curate audience groups with greater precision, identify users, and retarget "warm prospects – like those who opened a message or browsed a product category."[62]

92.  The information collected by the Bounce Exchange Tracker from NCAA Website visitors includes "IP address, browser type, operating system, Internet Service Provider, referrer address, the time/date an ad is served and the site or mobile app that the ad is served in addition to other log file information," which is "used to offer products and Services designed to help [its] Clients better understand how their websites are being utilized, draw insights on how to better engage Users on their sites, to deliver more relevant advertising messages based

---

[60] Molly Shuttlesworth, *Wunderkind Audiences for Meta: Precision Targeting, Elevated*, WUNDERKIND (Oct. 28, 2025), https://www.wunderkind.co/blog/article/audiences-for-meta/ (last visited Dec. 3, 2025).

[61] *Id.*

[62] *Id.*

upon the User visits to their sites, and to provide Clients with ad delivery reports."[63]

93.    In addition, "[a]s with most web technologies, Wunderkind may leverage cookies to track user history across pages and sessions. Cookies allow [Wunderkind] to maintain information about end-users, improve the user shopping experience, and make intelligent segmentation decisions when serving onsite, triggered email, and text campaigns."[64]

94.    In other words, Wunderkind stores and analyzes information collected from NCAA Website visitors and compiles comprehensive user profiles by tracking these visitors across the internet, and provides that valuable information to its customers, such as Defendants, enabling them to sell advertising space on their websites to earn revenue, and to place advertisements on other companies' websites to drive brand awareness and increase website visits.

95.    One of the cookies installed by the Bounce Exchange Tracker on NCAA Website users' browsers is bounceClientVisitXXXXc, which is designed to collect and retain "user browsing activity and may be used to understand about [user]

---

[63] *Wunderkind Privacy Policy, supra* note 55.

[64] *Wunderkind Cookies and Consent Management Platforms*, WUNDERKIND SUPPORT,    https://support.wunderkind.co/hc/en-us/articles/25775724847771-Wunderkind-Cookies-and-Consent-Management-Platforms (last visited Dec. 3, 2025); *see also Wunderkind Privacy Policy, supra* note 55.

demographics, such as age and gender."[65]

96.    Defendants have installed the Bounce Exchange Tracker on the NCAA Website to monetize user data by participating in Wunderkind's behavioral marketing and identity-resolution platform. By allowing Wunderkind's tracking code to collect Website users' IP addresses, location, device characteristics, and browsing activity, Defendants enable Wunderkind to recognize returning visitors, enrich user profiles, and deliver personalized advertising and marketing messages. These marketing integrations increase Defendants' advertising and conversion revenues by allowing them to re-target visitors across sessions, browsers, and devices. By embedding Wunderkind's tracking technology on the NCAA Website, Defendants benefit financially from the use of visitors' personal data for profiling and marketing purposes, while disclosing that data to third parties without adequate notice or consent. Through this unauthorized data sharing, Defendants have prioritized their commercial interests over users' privacy rights.

97.    The following are screenshots demonstrating operation of the Bounce Exchange Tracker on an NCAA Website visitor's browser – specifically, Defendants' sharing of the visitor's IP address, location, and additional device information with Wunderkind and placement of the Bounce Exchange Tracker on

---

[65] *bounceClientVisit*, COOKIE LIBRARY, https://cookielibrary.org/cookie_consent/bounceclientvisit/ (last visited Dec. 3, 2025).

the visitor's browser. In this image, the user's IP address, geolocation (including precise latitude and longitude), and additional device information (see the bottom three red boxes in the right-hand column) are being collected by the Bounce Exchange Tracker, as reflected in the first red box in the left-hand column, while visiting the NCAA Website (see the bottom red box in the left-hand column). The image also reflects the placement of the bounceClientVisitXXXXc cookie on the visitor's browser (see the top red box in the right-hand column).



98.    The two images below illustrate how – because the Bounce Exchange

1  Tracker does not rely solely on third-party cookies to track users across websites –

2  it is able to extract users' information even when a user is browsing on Safari, which

3  has tracking prevention features as well as IP masking from known trackers, by

4  manipulating first-party cookies to enable server-side tracking. The illustrative

5  screenshots below show the transmission of IP addresses (second red box in the

6  second image), geolocation coordinates (third red box in the second image), and

7  browser information (first red box in the second image) by the Bounce Exchange

8  Tracker (see red box in the first image) on the Safari browser:



## VI.   **Plaintiffs' Experiences**

### Plaintiff Maren Anderson

99.   Plaintiff Maren Anderson has visited the NCAA Website numerous times to read its content, including on or about April 6, 2025. When Ms. Anderson has visited the NCAA Website, she has been in the State of California.

100.   On information and belief, during Ms. Anderson's visits to the NCAA

Website, Defendants caused one or more of the Trackers to be installed on her browser, and Defendants used the Trackers to collect Ms. Anderson's personal information, including her IP address and the other information discussed above, and to track her across the internet.

101.   Defendants used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Ms. Anderson's location, and ultimately boost their and their advertisers' revenue. Defendants also shared the information collected by the Trackers with various third parties, including data brokers.

102.   When Ms. Anderson visited the NCAA Website, she was unaware of Defendants' tracking practices.

103.   Ms. Anderson did not provide consent prior to the installation of the Trackers on her browser.

104.   Defendants did not obtain a court order before installing or using the Trackers on Ms. Anderson's browser.

Plaintiff Valeria Gonzalez

105.   Plaintiff Valeria Gonzalez has visited the NCAA Website numerous times to read its content, including on or about July 7, 2025. When Ms. Gonzalez has visited the NCAA Website, she has been in the State of California.

106.   On information and belief, during Ms. Gonzalez's visits to the NCAA

Website, Defendants caused one or more of the Trackers to be installed on her browser, and Defendants used the Trackers to collect Ms. Gonzalez's personal information, including her IP address and the other information discussed above, and to track her across the internet.

107.   Defendants used the information collected by the Trackers to analyze Website data and marketing campaigns, conduct targeted advertising based on Ms. Gonzalez's location, and ultimately boost their and their advertisers' revenue. Defendants also shared the information collected by the Trackers with various third parties, including data brokers.

108.   When Ms. Gonzalez visited the NCAA Website, she was unaware of Defendants' tracking practices.

109.   Ms. Gonzalez did not provide consent prior to the installation of the Trackers on her browser.

110.   Defendants did not obtain a court order before installing or using the Trackers on Ms. Gonzalez's browser.

## CLASS ACTION ALLEGATIONS

111.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and, pursuant to Federal Rule of Civil Procedure 23, on behalf of all those similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

112.    Plaintiffs propose the following Class, consisting of and defined as follows:

> All California residents who accessed NCAA.com and had their IP addresses and other personal information collected by one or more third-party trackers, including but not limited to the Adform Tracker, the Adnxs Tracker, and the Bounce Exchange Tracker, during the relevant time period.

113.    Excluded from the Class are Defendants, their subsidiaries, parents, successors, predecessors, assigns, agents, affiliates, and any entity or division in which Defendants have a controlling interest; current or former employees, officers and directors of Defendants; and the Judge to whom this case is assigned and the Judge's staff. Plaintiffs reserve the right to redefine the Class and to add subclasses as appropriate based on discovery and specific theories of liability.

114.    **Numerosity**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of the entire Class is currently unknown to Plaintiffs at this time; however, given that, on information and belief, Defendants have millions of visitors to the NCAA Website, it is reasonable to presume that the number of Class members is in the thousands. The exact identities of Class Members may be ascertained by the records maintained by Defendants.

115.    **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members,

including, but not limited to:

    A.  Whether the Trackers are pen registers as defined by law;

    B.  Whether Defendants had consent from Plaintiffs and Class members to collect their IP addresses, device fingerprinting data, or other personal information; and

    C. Whether Defendants sought or obtained a court order to utilize the Trackers on the NCAA Website.

116.  **Typicality**: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all Class Members, visited the NCAA Website and had their IP addresses and other personal information collected by the Trackers.

117.  **Adequacy**: Each Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom they are similarly situated, as demonstrated herein. Plaintiffs' attorneys, the proposed class counsel, are experienced in handling consumer and other class actions.

118.  **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of the Class. The elements of the legal claims brought by Plaintiffs and Class Members are capable of proof at trial through evidence that is common to the Class rather than individual to its members.

119.  **Superiority**: A class action is a superior method for the fair and

efficient adjudication of this controversy because class-wide damages are essential to induce Defendants to comply with California law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

## CAUSES OF ACTION

## COUNT ONE

### VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT CAL. PENAL CODE § 638.51

120.    Plaintiffs repeat, re-allege, and incorporate by reference, the preceding paragraphs above as if fully set forth herein.

121.    California Penal Code Section 638.51 prohibits any person from using a "pen register" without a court order or consent.

122.    The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." CAL. PENAL CODE § 638.50(b).

123.   The Trackers are "pen registers" because they are devices or processes that captured "the routing, addressing, or signaling information" – the IP addresses – from the electronic communications transmitted by Plaintiffs' computers and/or mobile devices. CAL. PENAL CODE § 638.51(a).

124.   Defendants installed the Trackers on Plaintiffs' browsers and used the Trackers to collect Plaintiffs' IP addresses and other personal information and to track Plaintiffs.

125.   IP addresses constitute routing and addressing information and do not reveal the contents of the communications between users and the NCAA Website.

126.   Plaintiffs did not provide their consent prior to Defendants' installation or use of the Trackers on their browsers.

127.   Defendants were not authorized by any court order to use a pen register to track Plaintiffs' and Class members' IP addresses and other personal information.

128.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request that this Court:

A. Determine that the claims alleged herein may be maintained as a class

action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class defined above;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C. Award statutory damages to Plaintiffs;

D. Award compensatory damages to Plaintiffs;

E. Award reasonable attorneys' fees and costs to Plaintiffs;

F. Award pre-judgment and post-judgment interest on such monetary relief; and

G. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

DATED: December 5, 2025

**KAHN SWICK & FOTI, LLC**

By: */s/ Kim E. Miller*
Kim E. Miller (SBN 178370)
kim.miller@ksfcounsel.com
1901 Avenue of the Stars, 2nd Floor
Los Angeles, California  90067
Telephone: (504) 455-1400

*Counsel for Plaintiffs and the Putative Class*