UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-11576-MWC-MBK Date: March 25, 2026

Title: Maren Anderson *et al.* v. National Collegiate Athletic Association *et al.*

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings: (IN CHAMBERS) ORDER DENYING DEFENDANTS' MOTION TO DISMISS (DKT. 21)**

Before the Court is a motion to dismiss filed by Defendants National Collegiate Athletic Association and Turner Sports Interactive, Inc. (collectively, "Defendants"). *See* Dkt. # 21 ("*Mot.*"). Plaintiffs Maren Anderson and Valeria Gonzalez (collectively, "Plaintiffs") opposed, *see* Dkt. # 28 ("*Opp.*"), and Defendants replied, *see* Dkt. # 30 ("*Reply*"). The Court finds this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers, the Court **DENIES** Defendants' motion to dismiss.

I. Background

This case arises out of Plaintiffs' use of www.NCAA.com (the "Website") and Defendants' alleged transmission of Plaintiffs' data. *See* Dkt. # 1 ("*CAC*"). Plaintiffs' Class Action Complaint ("CAC") alleges as follows:

Defendant National Collegiate Athletic Association ("NCAA") is an incorporated association that operates the Website. *Id.* ¶ 11. Defendant Turner Sports Interactive, Inc. ("Turner") is a Georgia corporation that is responsible for creating and managing digital platforms for sports entertainment events, including by operating the Website. *Id.* ¶ 12.

An IP address is a globally unique numerical identifier assigned by an internet service provider. *Id.* ¶ 16. IP addresses function as "the essential addressing system of the internet" and can reveal geographical location information. *Id.* ¶¶ 16–17. IP addresses can also allow businesses to track user interactions across multiple websites, which can allow

companies to "build detailed profiles of individual users' daily routines, movements, and behaviors," but only if individuals use the same device at various locations. *Id.* ¶ 18.

Cookies "are small computer files that are automatically generated and stored on a user's browser cache (a form of temporary storage) when a user visits a website." *Id.* ¶ 20. "These identifiers act as digital tags that link users to data stored on a website's or ad network's servers . . . ." *Id.* Cookies can be either "third-party cookies" or "first-party cookies." *Id.* "First-party cookies are created and stored directly by the web server of a website that a user is visiting . . . ." *Id.* ¶ 21. "[T]hird-party cookies are created and stored by someone other than the owner of the website," like advertising networks, analytics providers, or data brokers. *Id.* This information allows advertisers to target their marketing at website users. *Id.* "Cookies . . . enable website owners to build up detailed user profiles that may include users' personal information . . . ." *Id.* ¶ 23. "[C]learing cookies or switching browsers may not fully prevent tracking . . . ." *Id.* Even though cookies are domain-specific, many advertising platforms can utilize "cookie syncing," which allows those platforms to share information they have both gathered. *See id.* ¶ 24.

One alternative to cookies is "first-party data." *See id.* ¶ 27. First-party data is "information businesses collect directly from their users through interactions on owned channels such as websites, mobile apps, and offline stores." *Id.* (internal quotation marks and footnote omitted). Another alternative to cookies is "device fingerprinting, which is a tracking technique that identifies a device based on its unique configuration." *Id.* ¶ 28 (internal quotation marks and footnote omitted). Companies can also use "digital fingerprinting," which "works by connecting and reconciling disparate customer data and identifiers from multiple sources . . . into a single unique user identifier." *Id.* ¶ 29.

When an individual visits the Website, the individual's browser sends an "HTTP request" or a "GET" request to Defendants' servers, which includes the individual's IP address. *Id.* ¶ 43. Defendants respond with an "HTTP response" back to the browser, including a set of instructions of how to load and display the Website content. *Id.* "The HTTP response also causes one or more third-party [t]rackers to be installed on the user's browser," and the trackers can store third-party cookies in the browser caches on the users' devices, "enabling the third parties to recognize returning users . . . ." *Id.* ¶ 38.[1] On later visits to the Website, trackers locate the unique cookie identifier on the user's browser and

[1] The CAC lists two separate paragraphs as paragraph 38. Here, the Court references the paragraph 38 on page 20 of the CAC.

cause the browser to again send the user's IP address, device information, and other personally identifying information, to the third party. *Id.* ¶ 44. "The [t]rackers that Defendants are installing on Website users' browsers analyze and store the data collected from Website users and, in many cases, combine it with other data they have obtained about users, to more accurately target advertising to them . . . ." *Id.* ¶ 45.

"The personal information obtained and distributed by Defendants has significant economic value as consumers' personal information is viewed as a form of currency in the e-commerce industry." *Id.* ¶ 46. And "[c]onsumers, like Plaintiffs and all Class Members, suffer economic injury as a result of Defendants accessing and using their personal information, and Defendants sharing their information with third parties." *Id.* "Plaintiffs and Class Members are also injured by losing their right to control their personal information and their ability to remain anonymous as they navigate the internet." *Id.* ¶ 47. Defendants embed tracking technology on the Website, causing individuals using the Website to connect with third-party servers, transmitting individuals' IP addresses, device identifiers, and communications content to third parties. *Id.* ¶ 48. "Defendants do not request or obtain consent from users before installing the [t]rackers on their browsers . . . ." *Id.* ¶ 49.

Defendants installed tracking technology on the Website. One of the trackers was the "Adform tracker," which is designed to create marketing campaigns based on internet activity. *Id.* ¶¶ 52–53. When a user visits the Website, the user's browser sends an HTTP request to Defendants' server, which sends an HTTP response "with directions to install the Adform Tracker on the user's browser . . . ." *Id.* ¶ 54. The Adform tracker stores cookies on the user's browser, and "instructs the user's browser to automatically transmit the user's IP address and other personally-identifying information to Adform, which Adform then shares" with third parties. *Id.* At least one Adform cookie remains on the user's browser for 60 days. *Id.* ¶ 55. Adform collects users' "1st Party IDs, Cookie IDs, and technical data related to these IDs" like "impressions, clicks, conversions, approximate geolocation, timestamp, URL, device information," browser information, and IP address. *Id.* ¶ 56. Using this information, Adform can create or enhance a user's profile. *Id.*

Another company interacting with the Website is Audiencerate, a California data broker. *Id.* ¶ 58. In connection with the Adform tracker, "browsers may also transmit reference identifiers associated with Audiencerate's third-party cookies." *Id.* ¶ 59. One Audiencerate cookie is the "arcki2 cookie," which gathers information on user behavior to improve website performance and target advertisements. *Id.* The arcki2 cookie persists

on a user's device for 15 days. *Id.* The information that Audiencerate gathers includes the IP address, URL visited, time, location, browser, and cookie ID. *Id.* ¶ 60. This information allows Audiencerate to conduct targeted advertising based on user profiles. *Id.* ¶ 61. The CAC includes an illustrative screenshot demonstrating how Audiencerate interacts with the Website. *Id.* ¶ 84.

The Website also provides information to OpenX, a registered data broker. *Id.* ¶ 63. OpenX collects users' "unique online identifiers," which allow OpenX to identify users across devices and over time utilizing IP addresses, cookie IDs, mobile advertising ID, hashed email address, and user agent string. *Id.* ¶ 64. OpenX also collects browsing history and online behavior, geolocation information (typically "as inferred" from a user's IP address), browser information, device information, service provider information, and data related to interactions with advertisements. *Id.* OpenX's cookies allow the company to link a user's browser or device to its internal records and information shared by advertising partners. *Id.* ¶ 65. At least one of OpenX's cookies remain on the user's browsers for one year. *Id.* The data OpenX collects allows the company to "serve targeted advertisements based on users' geographic locations." *Id.* ¶ 71. The CAC includes an illustrative screenshot demonstrating how OpenX interacts with the Website. *Id.* ¶ 72.

The Website utilizes the "Adnxs tracker" as well. *Id.* ¶ 73. Microsoft owns and operates the Adnxs tracker. *Id.* When a user visits the Website, the user's browser sends an HTTP request to Turner's server, and Turner's server sends an HTTP response with directions to install the Adnxs tracker on the user's browser. *Id.* ¶ 74. The Adnxs tracker "instructs the user's browser to automatically transmit the user's IP address and other personally-identifying information to Microsoft and stores cookies on the user's browser." *Id.* "The Microsoft Advertising platform is a real-time bidding system and ad server." *Id.* ¶ 75 (internal quotation marks omitted). The Adnxs cookies enable targeted advertising and measure the performance of those advertisements. *Id.* ¶ 78. Over time, repeated Adnxs cookies allows Microsoft to track "users across multiple browsing sessions by linking new IP addresses to the unique cookies." *Id.* ¶ 79. Through these processes, the Adnxs tracker "fingerprints" each user who visits the NCAA website, "creating a comprehensive record of the user's geographic locations and Website activities across all" of their devices. *Id.* ¶ 80. Ultimately, "Defendants enable Microsoft Advertising to deliver sponsored or personalized advertising based on users' geographic location and browsing activity." *Id.* ¶ 81; *see also id.* ¶¶ 82–83. The CAC includes an illustrative screenshot demonstrating how the Adnxs tracker interacts with the Website. *Id.* ¶ 84.

The final tracker is the Bounce Exchange tracker, which is owned and operated by Wunderkind. *Id.* ¶ 85. The technology tracks browsing history, search history, and information related to a user's interaction with a website or advertisement. *Id.* ¶ 88. That information allows Wunderkind to place targeted advertisements. *Id.* ¶ 87. Wunderkind partners with Meta Ads Manager and provides user identification data. *Id.* ¶ 91. The Bounce Exchange tracker collects information like users' IP addresses, browser types, operating systems, internet service provider, referrer address, the time and date of ad service, and the site or mobile application on which the tracker places the ad. *Id.* ¶ 92. Wunderkind may leverage cookies to track user history across pages and sessions, *id.* ¶ 93, and the company can monetize user data by participating in Wunderkind's behavioral marketing and identity-resolution platform, *id.* ¶ 96. By using Wunderkind technology, "Defendants benefit financially from the use of visitors' personal data for profiling and marketing purposes, while disclosing that data to third parties without adequate notice or consent." *Id.* The CAC includes illustrative screenshots demonstrating how the Bounce Exchange tracker interacts with the Website. *Id.* ¶¶ 97–98.

Plaintiff Maren Anderson has visited the Website several times, including on April 6, 2025. *Id.* ¶ 99. Ms. Anderson believes that Defendants "caused one or more of the [t]rackers to be installed on her browser, and Defendants used the [t]rackers to collect Ms. Anderson's personal information, including her IP address" and other information "to track her across the internet." *Id.* ¶ 100. Defendants utilized the collected information to target advertising at Ms. Anderson and "boost their and their advertisers' revenue." *Id.* ¶ 101. When Ms. Anderson visited the Website, she was unaware of the tracking practices, nor did she consent to the installation of the trackers on her browser. *Id.* ¶¶ 102–03.

Plaintiff Valeria Gonzalez has visited the Website several times, including on July 7, 2025. *Id.* ¶ 105. Ms. Gonzalez believes that Defendants "caused one or more of the [t]rackers to be installed on her browser, and Defendants used the [t]rackers to collect Ms. Gonzalez's personal information, including her IP address" and other information "to track her across the internet." *Id.* ¶ 106. Defendants utilized the collected information to target advertising at Ms. Anderson and "boost their and their advertisers' revenue." *Id.* ¶ 107. When Ms. Gonzalez visited the Website, she was unaware of the tracking practices, nor did she consent to the installation of the trackers on her browser. *Id.* ¶¶ 108–09.

The CAC includes one cause of action for violation of the California Invasion of Privacy Act ("CIPA") under California Penal Code § 638.51. *See id.* ¶¶ 120–28. Plaintiffs propose the following class: "All California residents who accessed NCAA.com and had

their IP addresses and other personal information collected by one or more third-party trackers, including but not limited to the Adform Tracker, the Adnxs Tracker, and the Bounce Exchange Tracker, during the relevant time period." *Id.* ¶ 112.

## II. Legal Standard

Rule 8 requires a complaint to clearly establish the claims and parties such that a defendant would have "no difficulty in responding to the claims with an answer and/or with a Rule 12(b)(6) motion to dismiss." *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131–32 (9th Cir. 2008). Pleadings that are "verbose, confusing and conclusory" are subject to dismissal. *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981). A plaintiff fails to comply with Rule 8 if "all defendants are lumped together in a single, broad allegation." *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City & Cnty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, a cause of action's elements that are "supported by mere conclusory statements[] do not suffice." *Id*. Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction," and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 377 (1994). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *Id*.

A Rule 12(b)(1) jurisdictional attack can be facial, based on the legal sufficiency of the claim, or factual, based on the legal sufficiency of the jurisdictional facts. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When considering a facial attack, the Court considers the complaint's allegations to be true, and it draws all reasonable inferences in the plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (citation omitted). If a party raises a factual challenge to subject matter jurisdiction, the court may review other evidence to resolve the factual dispute concerning jurisdiction. *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). If the court determines at any time that it lacks subject matter jurisdiction, it must dismiss the action. Fed. R. Civ. P. 12(h)(3)

## III. Discussion

### A. Standing

#### *i. Article III Standing*

Article III confines the federal judicial power to the resolution of "Cases" and "Controversies." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. If "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016) (internal citation omitted).

Defendants argue that Plaintiffs have failed to show either economic harm or an intangible injury. *See Mot.* 5–11. Plaintiffs need not prevail on both forms of harm—instead, "a plaintiff need only show a slight injury for standing." *City of L.A. v. Barr*, 929 F.3d 1163, 1173–74 (9th Cir. 2019) (citing *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)). And Plaintiffs here have at least shown an injury to their right to privacy sufficient to confer standing.

Defendants correctly identify the importance of the Ninth Circuit's recent decision in *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025). There, the panel affirmed the grant of a motion to dismiss in a case against a provider of "session-replay technology," which allows a business utilizing the technology to access consumer data and "recreate the website visitors' entire visit to the website." *Id.* at 786 (internal quotation marks omitted). The *Popa* court highlighted that the plaintiff failed to show that the disclosure of the relevant information would be "highly offensive to a reasonable man," *see id.* at 791 (citing *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019)) (emphasis omitted), and analogized the monitoring of the plaintiff's interactions with the website to "a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales," *see id.* Importantly, *Popa* concerned the monitoring of a user's interaction with one website rather than the installation of trackers that would extend to other websites. *See generally id.*

The CAC identifies that "Plaintiffs and Class Members are . . . injured by losing their right to control their personal information and their ability to remain anonymous as they navigate the internet." *CAC* ¶ 47. As the Supreme Court has recognized, "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person," and that the "extent of the protection accorded a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact . . . ." *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989). And "information may be classified as 'private' if it is 'intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public.'" *Id.* at 764 (citation omitted). Defendants are correct that an IP address alone is not sufficiently private information to confer standing. *See, e.g.*, *Wooten v. BioLife Plasma Servs., L.P.*, 807 F. Supp. 3d 1139, 1144 (E.D. Cal. 2025) ("Courts have held that there is no legally protected privacy interest in an IP address . . ." (citations omitted)). But Defendants' focus on IP addresses alone misunderstands Plaintiffs' case. The CAC offers that, based on the trackers that Defendants install on Plaintiffs' browsers, Defendants allow for the surreptitious capture, analysis, and storage of IP addresses, "browser and device information, unique digital identifiers, session data, clickstream activity, geolocation information, browsing history, and other personal information . . . ." *See CAC* ¶ 2. And because the cookies remain on users' browsers and "send unique identifiers to the third parties," Defendants have allowed for the persistent tracking of Plaintiffs across the internet. *See id.*

Defendants' assertion that such information is not private belies the experience of any internet user. Nor does that understanding comport with case law. *See, e.g.*, *Walsh v. Dollar Tree Stores, Inc.*, No. 25-cv-01601-SVK, 2025 WL 2939229, at *10 (N.D. Cal. Oct. 16, 2025) (identifying individual's browsing history and similar information as sufficiently private to support Article III standing); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) (explaining that "[a] right to privacy encompasses the individual's control of information concerning his or her person," and that tracking an individual's "likes, dislikes, interests, and habits over a significant amount of time" harms that individual's right to control their personal information (cleaned up)); *Moser v. Health Ins. Innovations*, No. 17cv1127-WQH(KSC), 2019 WL 2271804, at *12 (S.D. Cal. May 28, 2019) (noting that "there are significant privacy concerns with requiring an individual to broadly produce or disclose 'browsing history'" (citing *Riley v. California*, 573 U.S. 373, 395–96 (2014))).

Other courts have rejected Defendants' same arguments. The case most analogous is *Harris v. iHeartMedia, Inc.*, No. 25-cv-06038-EKL, 2026 WL 247875 (N.D. Cal. Jan. 29, 2026), where the plaintiffs alleged that the defendant "place[d] third-party internet trackers on its users' browsers, causing their browsers to send identifying information to various third parties . . . ." *See id.* at *1. In analyzing standing, the *Harris* court explained that "the degree of dissemination of Plaintiff's information [was] broad," since "trackers store unique identifiers on the user's browser, and cause the browser to send identifying information, including the user's IP address and device metadata, to the third parties." *Id.* Those identifiers allowed the third parties to track users across the internet and create personalized profiles for users. *See id.* Ultimately, the Court determined that the plaintiff had "alleged the violation of a privacy interest that bears a close relationship to traditional harms – *i.e.*, the loss of the ability to control information about himself and to avoid the broad dissemination of that information." *Id.* at *2 (internal quotation marks omitted).

And the *Harris* court is not alone in reaching this conclusion. *See, e.g.*, *Hassid v. Alex and Ani, LLC*, No. CV 25-0679 FMO (JCx), 2026 WL 160535, at *2–3 (C.D. Cal. Jan. 20, 2026) (finding Article III standing where defendant installed third-party software that collected users' device and browser information, geographic information," referral information, and URL information, in addition to scanning websites for identifying information); *Camplisson v. Adidas Am., Inc.*, 809 F. Supp. 3d 1095, 1106 (S.D. Cal. 2025) (finding injury-in-fact where trackers on defendant's website "collected a broad set of their personal identifying and addressing information without their consent and in violation of

CIPA"); *Pemberton v. Rest. Brands Int'l, Inc.*, No. 25-cv-03647-JSC, 2025 WL 3268404, at *3 (N.D. Cal. Nov. 24, 2025) (ruling that allegations that defendants permitted third parties to use cookies to collect, track and compile "browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data" were sufficient to plead standing (internal quotation marks omitted)).

Defendants also assert that Plaintiffs have not shown that the disclosed information was sufficiently offensive to be actionable at common law. *See Mot.* 8–10. As this Court has previously detailed, the Ninth Circuit and other courts have identified that this issue is often inappropriate to resolve at the pleading stage. *See Lewis v. Magnite, Inc.*, No. 2:25-cv-03448-MWC-SSCx, 2025 WL 3687546, at *9 (C.D. Cal. Dec. 4, 2025) (collecting cases). But, as in *Lewis*, the CAC sufficiently alleges highly offensive conduct for purposes of resolving Defendants' motion to dismiss. *See id.* The CAC notes that the third parties collect information that allows them to track users' patterns of movement and build detailed profiles of individual users' lives, without ever receiving the users' consent to do so. *See generally CAC*.

Defendants' last contention is that the CAC is insufficiently specific with respect to these specific Plaintiffs. *See Mot.* 10–11. But Defendants demand a level of detail that Plaintiffs need not provide. Instead, Plaintiffs identify that they visited the Website and that they were subject to the tracking the CAC outlines. *See CAC* ¶¶ 99–110. They also note that they were unaware of Defendants' practices and did not provide consent for Defendants to install the trackers. *See id.* And the CAC refers to the information that the trackers collect and disseminate. *See id.* Defendants effectively ask the Court to avoid drawing reasonable inferences in Plaintiffs' favor in contravention of well-established authority mandating the contrary. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (requiring courts to draw all reasonable inferences in favor of plaintiffs when considering a motion to dismiss under 12(b)(1)). The Court will not do so.

For these reasons, the CAC sufficiently establishes Article III standing necessary to survive a motion to dismiss under Rule 12(b)(1).

*ii. Statutory Standing*

The parties agree that Plaintiffs must plead an injury under CIPA. *See Mot.* 11–12; *Opp.* 16–18. Defendants largely repeat their arguments as to Plaintiffs' Article III injury

when alleging that Plaintiffs lack standing under CIPA. *See Mot.* 11–12 (arguing that Plaintiffs "do not have a reasonable expectation of privacy" in the information collected). For the same reasons that the Court determined Plaintiffs to have sufficiently alleged an injury under Article III, they plead an injury under CIPA. *See supra* Section III.A.i. Defendants provide no authority to support the idea that CIPA's injury-in-fact requirement is more stringent than that of Article III. By contrast, other similarly situated courts have found an injury like Plaintiffs' sufficient to plead an injury under CIPA. *See, e.g.*, *Deivaprakash v. Condé Nast Digit.*, 798 F. Supp. 3d 1100, 1106 (N.D. Cal. 2025) (finding statutory standing under CIPA based on plaintiff's allegation of "a privacy invasion based on the creation of a detailed profile and his reduced capacity to remain anonymous"); *Harris v. iHeartMedia, Inc.*, No. 25-cv-06038-EKL, 2026 WL 247875, at *2 n.4 (N.D. Cal. Jan. 29, 2026) ("[F]or the same reasons Plaintiff has alleged an Article III injury, he has also alleged a statutory CIPA injury."); *Camplisson*, 809 F. Supp. 3d at 1104 ("A violation of one's privacy rights is an injury in itself [under CIPA], and the statute does not require more.").

For these reasons, the CAC sufficiently establishes statutory standing under CIPA.

B. Failure to State a Claim

*i. Operation of Pen Register*

Defendants next assert that the Court should dismiss the CAC under Rule 12(b)(6) because their actions could not fall within the ambit of § 638.51. *See Mot.* 12–19. To do so, Defendants rehash arguments that many courts—including this one—have rejected.

CIPA defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). Like the tracker in *Lewis*, the trackers that Defendants install "record[] Plaintiffs' movements across the internet as they move across the internet," and, to do so, these trackers "would necessarily have to capture destination information, more than plausibly including the 'dialing, routing, addressing, or signaling information from which a wire or electronic communication is transmitted . . . .'" *Lewis*, 2025 WL 3687546, at *13 (quoting Cal. Penal Code § 638.50(b)); *see English v. IKON Bus. Sols., Inc.*, 94 Cal. App. 4th 130, 143 (2001) ("The axioms of statutory

construction require us first to look at the words used by the Legislature. If the language is unambiguous, our task is finished.").

Other courts have rebuffed the same arguments. *See, e.g.*, *Maketa v. Valnet Inc.*, No. 25-cv-05517-RS, 2026 WL 323126, at *1 (N.D. Cal. Feb. 6, 2026) ("The arguments [defendants] make[], however, have been consistently rejected by the federal courts." (collecting cases)); *see also Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928 (N.D. Cal. 2024) (noting that "courts should focus less on the form of the data collector and more on the result," since the trackers at issue "are at least a process because it is software that identifies consumers, gathers data, and correlates that data" (internal quotation marks and citations omitted)).

Though Defendants seize on an errant reference in the CAC to "communications content," *see Mot.* 13, the data transmission that the CAC describes in detail does not concern communications content under the plain language of the statute. Nor would this errant reference be a basis for dismissal at this stage given the other data collection that the CAC describes. *See Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) ("Having found that the browser and device data plausibly fall within the scope of the statute, the Court need not determine whether the form data also falls within the scope of the statute, as even if the form data did constitute 'contents' beyond the scope of §§ 638.50 and 638.51, a defendant may not dismiss only a portion of a claim under Rule 12(b)(6)."); *see also In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1153 (N.D. Cal. 2025) ("Given CIPA's purpose to protect Californians' privacy, it is highly unlikely that the Legislature intended to permit the installation and use of pen registers so long as those devices also record the contents of a third party's communications.").[2]

Defendants next aver that Plaintiffs cannot rely on the conduct of parties acting "downstream" from the actor subject to liability under CIPA. *See Mot.* 14–16. CIPA's plain text forecloses Defendants' argument. The relevant provision creates liability for an

[2] Defendants argue that *Meta Pixel* was incorrect in finding ambiguity in the statutory language. *See Mot.* 13 n.6. But, as the *Meta Pixel* court explained, Defendants ask the Court to read the statutory language to reach an illogical result, *see Meta Pixel*, 793 F. Supp. 3d at 1153, which the Court cannot do, *see Collins v. Gee W. Seattle LLC*, 631 F.3d 1001, 1005 (9th Cir. 2011) (noting that "we may not read a statute's plain language to 'produce a result contrary to the statute's purpose or lead to unreasonable results.'" (quoting *United States v. Combs*, 379 F.3d 564, 569 (9th Cir. 2004))).

actor who "install[s] or use[s] a pen register or a trap and trace device . . . ." Cal. Penal Code § 638.51(a). The CAC details Defendants' actions to install third-party tracking software. *See, e.g.*, *CAC* ¶¶ 43, 38[3] (explaining that "[w]hen an individual visits the NCAA Website . . . their browser sends an 'HTTP request' or a 'GET' request to Defendants' servers . . . and Defendants respond with an 'HTTP response' back to the browser with a set of instructions of how to load and display the NCAA Website content. The HTTP response also causes one or more third-party Trackers to be installed on the user's browser.").

But Defendants contend that CIPA requires more—relying on § 637.2, Defendants attempt to escape liability by arguing that they were not parties who caused Plaintiffs to be "injured" by a violation of the statute. *See Mot.* 15–16. Defendants' argument is a fruitless effort to attenuate. Defendants installed the alleged pen registers, and those pen registers caused Plaintiffs to lose the right to control their personal information. Even if Defendants were not responsible for every aspect of Plaintiffs' injuries, on those facts alone, the CAC pleads enough to state a claim. *See Shah*, 754 F. Supp. 3d at 931 ("Even if third parties developed and used the [Tracker] software, it is alleged that Fandom was responsible for integrating the third-party script into its own website. Based on this, Plaintiffs' allegation that Fandom installed the Trackers is sufficient to state a claim." (internal quotation marks and citations omitted)); *see also Fregosa v. Mashable, Inc.*, No. 25-cv-01094-CRB, 2025 WL 2886399, at *8 (N.D. Cal. Oct. 9, 2025) ("Mashable deliberately embedded third-party trackers on its website, knew that those trackers would capture visitors' IP addresses and device metadata, and used the resulting data in concert with Microsoft, Wunderkind, and PubMatic to facilitate targeted advertising. That active role is enough to plead 'use' under § 638.51, even if technical operations were handled by third parties." (citation omitted)).

Defendants also try to serve the Court a hash of legislative history to support an interpretation that contravenes the text of the statute. *See Mot.* 16–18. Though Defendants do all they can to muddy the waters of their own argument, the crux of their assertion is that "the alleged interception of information is not related to a user's communications with another person and is rather related to a user's device," and that since "neither Defendants nor third parties know the identity of the user before the alleged collection of information," Plaintiffs cannot state a claim under § 638.51. *See id.* 18. The Court has already detailed why the trackers constitute devices that "record[] or decode[] dialing, routing, addressing,

[3] As the Court previously explained, the CAC lists two separate paragraphs as paragraph 38. *See* Section I n.1. Again, this reference is to the paragraph 38 on page 20 of the CAC.

or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted . . . ." *See* Cal. Penal Code § 638.50(b). In laying out their circuitous logic, nowhere do Defendants engage the plain text of the statute—but "[w]here the statute's language is plain we do not consider the legislative history or any other extrinsic material." *Republic of Ecuador v. Mackay*, 742 F.3d 860, 864 (9th Cir. 2014) (internal quotation marks and citations omitted); *see also Lewis*, 2025 WL 3687546, at *13 (identifying that defendant "glosse[d] over the requisite textual analysis in favor of weighing extraneous factors" and "unilaterally add[ed] modifiers to the statute").

Defendants' final statutory interpretation argument is that the California Consumer Protection Act ("CCPA") "demonstrates that the legislature did not intend to address internet tracking through a criminal statute like CIPA." *Mot.* 18–19. The "CCPA does not preempt CIPA. In fact, CCPA states that 'law relating to consumers' personal information should be construed to harmonize with provisions of this title.'" *Mirmalek v. L.A. Times Commc'ns LLC*, No. 24-cv-01797-CRB, 2024 WL 5102709, at *5 (N.D. Cal. Dec. 12, 2024) (quoting Cal. Civ. Code § 1798.175). Though Defendants admonish the Court to "not ignore the plain text of the statute and legislative intent," *see Mot.* 19, Defendants seem to be the ones doing so, as the CCPA provides that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control," *see* Cal. Civ. Code § 1798.175. As with Defendants' other arguments, courts have rejected this one too. *See, e.g.*, *Semien v. PubMatic Inc.*, No. 25-cv-03164-SI, 2026 WL 216333, at *10 (N.D. Cal. Jan. 27, 2026). Most importantly, by interpreting CIPA as it does, the Court heeds the CCPA's instruction.

*ii. Electronic Communication Service Provider Exception*

Defendants last contend that even if the Court determines that Defendants operated a pen register, they fall within the "Electronic Communication Service Provider Exception." *See Mot.* 19–20. Section 638.51(b)(1) of CIPA allows that "[a] provider of electronic or wire communication service may use a pen register or a trap and trace device . . . [t]o operate, maintain, and test a wire or electronic communication service." Defendants assert that they fall within this definition because they provide college sports-related content, videos, and news. *See Mot.* 19. In Defendants' view, "the website requires Plaintiffs' IP Addresses and device data to make the website function," so "they are exempt from CIPA liability . . . ." *Mot.* 20. Contrary to Defendants' suggestion otherwise, *see id.*, the CAC does not allege that the Website would be inoperable without the implementation

of the third-party trackers. And the crux of the issue—whether Defendants rely on the third-party trackers to "operate, maintain, and test" the Website, *see* Cal. Penal Code § 638.51(b)(1)—is a question of fact unfit for resolution on a motion to dismiss. *See In re Boeing Secs. Litig.*, 40 F. Supp. 2d 1160, 1178 (W.D. Wash. 1998) ("The Court cannot resolve on a motion to dismiss the factual issues raised by the defendants."). Thus, at this stage the Court cannot deem the "Electronic Communication Service Provider Exception" applicable.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss. The March 27, 2026, hearing is **VACATED**.

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ